UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

TYRELL BROWN, an infant by his aunt and guardian,
LETITIA INGRAM, and LETITIA INGRAM, individually,

                                Plaintiff,        No. 04-CV-6074 CJS

      -vs-

                                        DECISION AND ORDER

JOHN A. JOHNSON, Commissioner of the New York
State Office of Children and Family Services, GARY
ALMOND, Director of the Oatka Residential Center,
GARY WOOD, Youth Detention Counselor at the
Oatka Residential Center, JOSEPH CARTER,
Youth Detention Aide at the Oatka Residential
Center, and JOHN DOE, a Youth Division Counselor
at the Oatka Residential Center, All individually and
in their Official Capacities,

                              Defendants.

———————————————————————————

APPEARANCES

| | |
|---|---|
| For plaintiff: | David J. Hernandez, Esq. |
| | Michael S. Paulonis, Esq. |
| | Law Office of David J. Hernandez |
| | 26 Court Street, Suite 2200 |
| | Brooklyn, New York 11242 |
| | |
| For defendants Johnson, Almond, and Carter: | Richard Benitez, Esq. |
| | Office of the New York State |
| | Attorney General |
| | 144 Exchange Boulevard |
| | Rochester, NY 14614 |
| | |
| For defendant Wood: | Raymond M. Schlather, Esq. |
| | Diane Bruns, Esq. |
| | LoPinto, Schlather, Solomon & Salk |
| | 200 East Buffalo Street |
| | P.O. Box 353 |
| | Ithaca, New York 14851 |

1

INTRODUCTION

This is an action pursuant to 42 U.S.C. § 1983 and New York State law, in which the infant plaintiff, Tyrell Brown ("Tyrell"), seeks to recover for injuries that he sustained at the hands of adult staff members while a resident at a state-run residential detention facility for juveniles.  Now before the Court is a motion for summary judgment by defendants John Johnson ("Johnson"), Gary Almond ("Almond"), and Joseph Carter ("Carter") [#27], and a separate motion for summary judgment by defendant Gary Wood ("Wood") [#34].  For the reasons that follow, the applications are granted in part and denied in part.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most favorable to the non-moving plaintiff.[1]  On April 30, 2003, Tyrell, age 14, was a resident at the Oatka Residential Center ("Oatka") which is operated by the New York State Office of Children and Family Services.  At that time Johnson was the Commissioner of the Office of Children and Family Services, Almond was the Director of Oatka, Wood was a Youth Detention Counselor at Oatka, and Carter was a Youth Detention Aide at Oatka.  That day, Tyrell was sitting at a table on the lawn at Oatka, drawing a picture on a red sheet of paper, which prominently displayed the letters "B" and "K".  A staff member at Oatka observed Tyrell, suspected that the drawing was gang-related, and took the drawing to Wood, who was in his office.  Wood,

---

[1] The Court notes that in compiling the foregoing statement of facts, it has not relied upon an Arbitrator's Opinion and Award involving disciplinary action against Wood that resulted in the termination of his employment. (Pl. Appendix Ex. G).  As the Court explained during oral argument, the Arbitrator's Opinion and Award is not evidentiary proof in admissible form.

who stood 6'3" tall and weighed over 200 pounds, came out of his office and angrily confronted Tyrell about the drawing. Tyrell, who was 5' 6" tall and weighed 127 pounds, with a "slight build,"[2] denied that the drawing was gang-related. Wood then spun Tyrell around, pulled his arms behind his back, and "slammed" Tyrell face forward onto the ground. (Brown Dep. p. 67). Although there were at least three or four other adult staff members in the area, Wood did not call for assistance before restraining Tyrell. (Brown Dep. p. 39). Once on the ground, Wood pushed Tyrell's arms up, until Tyrell heard a cracking sound in his shoulder. While Wood was restraining Tyrell in this manner, defendant Carter, who had observed Wood "slam" Tyrell to the ground (Carter Dep. 26), approached and restrained Tyrell's legs. After a few minutes, Carter and Wood switched places, while maintaining the hold on plaintiff. According to Carter, he assumed the "primary" position of restraining plaintiff's arms and upper body at Wood's direction. (Carter Dep. p. 27). After Carter assumed the primary hold, he continued to push Tyrell's arms up, in the same manner as Wood had done.

Tyrell described the incident more specifically at his deposition as follows:

> I had a red piece of paper and I was from Brooklyn and started with a capital B and put a capital K and in between the capitals the r-o-o-k-l-y-n, Brooklyn, to put up on my wall. Staff had come and took it and said it was gang related and the staff – I don't recall the staff name but talk to [sic] Mr. Woods and Mr. Woods – it was like two minutes but he came out. He came out. He called me. I placed my hands behind my back, walked up to him. He said, "What is this." I said "This is where I'm from. Brooklyn" and he said it's gang related. BK stands for Blood Killer. I told him it wasn't gang related. He said "Why are you lying" and placed his hand on my shoulder and I said "I'm not lying." And he looked to the side like a quick glance type and then he grabbed me, turn me around quick and locked his arms with my arms and picked me up and slammed me on the

---

[2]Wood Dep. p. 65.

3

> floor and as I was on the floor he started pushing my arms up and I was
> crying because it was hurting.  It hurt.  I heard a crack in my shoulder and
> said "My arm."  I was kind of choked because of the pressure he was
> doing on me. . . .  I was crying and stuff and I said "my arm, my arm" and
> "Get up off me" so then as he got up off me Mr. Carter, he came on me
> and was doing the same thing, pushing my arm.  And I'm crying "My arm,
> get off me."

(Brown Dep. pp. 18-19; *see also, Id.* at 60-61: "He [Wood] . . . set his hands up like that

(indicates) and set my shoulder up and smashed me on the floor and started pushing it

up."; 71: "[H]e was going up and down with it and stuff like that.  Then he OD'd.  He

over did it and I heard a crack in my shoulder and I really started crying.").  Tyrell

additionally indicated that Wood was talking to him while he was restrained on the

ground, saying, "Like, 'Why you fucking lying to me."  I'm crying, trying to tell him I'm not

lying.  He got all this weight on me and I can't talk.  I'm crying." (*Id.* at 72).

Tyrell indicates that Wood essentially utilized the same restraint technique that

other adults had used on him at Oatka:

> [Pretend] I'm the staff.  Say a resident in front of me and I got his arm.  My
> hands would be inside like the back of his arms and back.  My hands be
> flat like that (indicates) and sometimes they do place their (indicates) and
> the other side, they beat you up regardless.  I'm telling the truth.  They
> pick you up and slam you on the floor and push your arms up and make
> you cry.

(*Id.* at 65).  As for Carter, Tyrell indicates that Carter "cranked" his arms in the same

manner that Wood had done: "I'm still on the ground.  I was still crying.  Mr. Woods was

standing up and Mr. Carter was dong the same thing, cranking me." (*Id.* at 73; *see also,

Id.* at 82: "I was getting cranked.").  Tyrell further stated:

Q. How did Mr. Carter apply the lock on you?

A. Pressure.

4

Q. Did he put a lock?

A. Like when Mr. Woods had my hands like Mr. Carter came up and grabbed my arms.  Like I say, you can't do nothing once they got you like that.

Q. What did you mean he was doing the same thing?

A. Put your arm up and make you cry.

(*Id*. at 74).  As a result of the use of force, Tyrell sustained a fractured shoulder.

Wood contends that he used force on Tyrell because Tyrell made a threatening gesture with his hands.  However, as indicated above, Tyrell stated that he had his hands behind his back during the incident.[3]  Wood also maintains that he brought Tyrell to the ground more violently than he had intended to because he slipped and fell. Carter, though, did not "recall" seeing Wood slip as he took Tyrell to the ground. (Carter Dep. p. 48).  Instead, according to Carter, Wood "sort of got in [Tyrell's] face," and "before you know it sort of like slammed the kid over on the ground and he started the restraint." (Carter Dep. p. 26).  It is undisputed that Wood did not call for assistance from Carter or other staff before using force on Tyrell.

As for the manner in which Wood restrained Tyrell, it is undisputed that Wood was trained in the use of the proper physical restraint technique and himself trained others in the technique. (Wood Dep. 56).  Nevertheless, at his deposition, Wood indicated that he did not recall the criteria for using the type of restraint that he placed on Tyrell. (Wood Dep. 68).  Moreover, Carter indicated that Wood's "take down" of Tyrell was "unusual" because Wood "sort of slammed [Tyrell] to the ground." (Carter

---

[3]As discussed further below, even if Tyrell "raised his hands," as Wood claims (Wood Memo [#38] p. 2), there would be issues of fact as to whether the subsequent use of force was excessive.

Dep. 54).

The use of force at Oatka was governed by policy "PPM 3247.13 Use of Physical Force," promulgated by the New York State Division for Youth. (Pl. Appendix Ex. H). The policy states that physical force is to be used only in situations where "there is no reasonable alternative," and then, staff are to "**employ only the minimum amount of force necessary to bring the resident/situation under control**." (Emphasis in original). Significantly, the policy indicates that "[p]hysical force shall not be used as punishment." The policy additionally states, in relevant part:

> F. CIRCUMSTANCES UNDER WHICH THE USE OF PHYSICAL FORCE MAY BE NECESSARY
>
> 1. To protect one's self.
>
> 2. To protect others . . . .
>
> 3. To protect the resident from self-harm . . . .
>
> 4. To protect property . . . .
>
> 5. To enforce a direct order to a resident . . . .
>
> 6. To prevent escape/AWOLS . . . .
>
> 7. To respond to an immediate threat to the safe, secure operation of the facility.
>
> Note: Only approved CM/PR [Crisis Management/Physical Restraint] technique will be used.

(Pl. Appendix Ex. H). The policy also requires that, "[i]n all cases where the use of force is/or will become necessary, staff shall call for assistance utilizing facility emergency response procedures." (*Id*.).

Prior to the incident involving Tyrell, various disciplinary proceedings had been

commenced against Wood by the Office of Children and Family Services. (Wood Dep. 24).  In or about 1995, when Wood was employed at the Louis Gossett, Jr. Residential Facility ("Louis Gossett"), he was investigated for allegedly using excessive force against a resident. (Wood Dep. 25-26).  Following the investigation, Wood received a written reprimand, which concluded that Wood "did not initiate excessive force," but that he "should have exercised more caution to see that the resident did not receive injuries." (Pl. Appendix Ex. I).  In or about 1996 Wood was investigated following a use of force by him and others at Louis Gossett which caused a juvenile resident, Lee Jackson, to lose consciousness. (Wood Dep. 25-26). *See, Jackson v. Johnson*, 118 F.Supp.2d 278, 283 (N.D.N.Y. 2000) (Indicating that the Lee Jackson incident occurred on June 1, 1996).  Significantly, however, the record does not indicate the outcome of that investigation.  In 1997 Wood was investigated for using a restraint at Louis Gossett that resulted in a juvenile resident sustaining a laceration on his face. (Wood Dep. 26). The Facility Director at Louis Gossett, Joseph Impicciatore, subsequently issued Wood a letter of reprimand, stating that Wood committed four types of misconduct during the incident, specifically: 1) initiating an escort of a resident without sufficient reason and without seeking assistance from other staff; 2) using force without sufficient reason and without seeking assistance from other staff; 3) using excessive an unnecessary force against the resident, resulting in "a large laceration above [the resident's] left eyebrow and abrasions on his chin and cheek"; and 4) failing to have his radio on his person when engaging in a physical escort and restraint. (Pl. Appendix Ex. J).

Almond selected Wood to work at Oatka in or about August 2000. (Pl. Appendix

Ex. K).  Almond interviewed Wood before hiring him, but he does not recall if he reviewed Wood's personnel records at part of the hiring process. (Almond Dep. 13-14).[4] Almond indicated, though, that he did not believe that he was aware, when he hired Wood, that Wood had been involved in a use of force that had resulted in a serious injury to a resident. (Almond Dep. 23).[5]   However, in January 2003, after he started working at Oatka, Wood was involved in an incident with a resident in which he allegedly used excessive force during an improper restraint.

Tyrell's aunt, Letitia Ingram ("Ingram"), commenced the subject lawsuit on February 26, 2004.  The complaint purports to state the following causes of action: 1) excessive force in violation of the 14th Amendment to the U.S. Constitution against all defendants; 2) retaliation, in violation of Tyrell's rights under the First Amendment to the U.S. Constitution against all defendants; 3) "intentional tort" in violation of New York State law against all defendants; 4) assault and battery in violation of New York State law against all defendants; 5) negligence against all defendants; and 6) loss of consortium on behalf of Ingram.   As to the § 1983 claims against Johnson and Almond, the complaint alleges that "[t]he abuse to which [Tyrell] was subjected was consistent with an institutional practice of the Office of Children and Family Services, which was known to and ratified by" Johnson and Almond. (Complaint ¶ 42).  Additionally, with regard to the first two claims, which are brought pursuant to 42 U.S.C.  § 1983,

---

[4]Almond indicated that Oatka did not have its own personnel office, and apparently there was a central personnel office for the Office of Children and Family Services at some other location. (Almond Dep. 29).

[5]Plaintiff offers, as an undisputed fact, that Almond "did not review Mr. Wood's personnel file before he" hired wood. (Pl. Stmt of Facts ¶ 19).  However, when asked whether he had reviewed Wood's personnel records, Almond actually testified, "I don't recall." (Almond Dep. 14).

defendants are all sued in their individual and official capacities.  The negligence claim alleges that Wood and Carter negligently injured Tyrell, and also asserts negligent training and supervision claims against Johnson and Almond.

Following discovery in this action, on December 4, 2006, Johnson, Almond and Carter filed the subject summary judgment motion [#27], seeking judgment on all claims.  They contend that: 1) they are entitled to judgment on the excessive force claim because Carter's actions were neither malicious or sadistic, while Johnson and Almond were not personally involved; 2) they are entitled to judgment on the First Amendment claim because they could reasonably restrict Tyrell's right to possess gang-related material, and in any event, he was restrained because he threatened Wood, not because of his drawing; additionally, Johnson and Almond contend that there were not personally involved in any constitutional violation; 3) they are entitled to judgment on the official capacity claims for damages because such claims are barred by the Eleventh Amendment; 4) they are entitled to judgment on the negligence claim, since plaintiff alleges that defendants committed an intentional tort, which is incompatible with negligence; and 5) they are entitled to judgment on Ingram's loss of consortium claim, because she sustained no damages.

On December 22, 2006, Wood filed a separate summary judgment motion [#34], contending that: 1) plaintiff has not established a prima facie case of excessive force; 2) Wood did not violate Tyrell's First Amendment rights, because he was entitled to enforce Oatka's policy banning gang-related material, and in any event, he did not restrain Tyrell because of the drawing; 3) there is no independent cause of action for

"intentional tort" under New York law; 4) plaintiff has not established a prima facie case of assault or battery; 5) the negligence claim must be dismissed, because it is asserted against Wood in his official capacity and must therefore be brought in the New York Court of Claims, or alternatively, because it is incompatible with the claims of intentional conduct; 6) the loss of consortium claim must be dismissed because Ingram suffered no damages; and 7) Wood is entitled to qualified immunity.

In opposition to the motions, plaintiff contends that: 1) there are issues of fact as to the 14th Amendment excessive force claim, and particularly as to Johnson and Almond, there are issues as to their personal involvement based upon Wood's employment history; 2) there are issues of fact as to the First Amendment retaliation claim; 3) defendants are not entitled to qualified immunity, since, *inter alia*, the right to be free from excessive force was well-established; 4) there are triable issues of fact as to the assault and battery claims; and 5) there are triable issues of fact on the negligence claims.  Plaintiff does not oppose defendants' motions insofar as they seek judgment on the official capacity claims or on the Third and Sixth causes of action, for "intentional tort" and loss of consortium, respectively.

Counsel for the parties appeared before the undersigned for oral argument on March 15, 2007.   The Court has thoroughly considered the entire record and the arguments of counsel.

## ANALYSIS

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the

non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).

With these general principles of law in mind, the Court will now proceed to consider the particular claims on their merits.

<u>14th Amendment Excessive Force</u>

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>
>       \*\*\*
>
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

The test for excessive force in the instant case is "whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (citing *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).  In determining whether the defendant acted

> maliciously or wantonly, [the] court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Id.* at 291 (citations and internal quotation marks omitted); *Jackson v. Johnson*, 118 F.Supp.2d 278, 287-288 (N.D.N.Y. 2000).  Moreover, "a claim of excessive force may be established even if the victim does not suffer "serious," or "significant" injury, provided that the amount of force used is more than " de minimis," or involves force that is "repugnant to the conscience of mankind." *U.S. v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999) (citations omitted).

Applying these applicable principles of law, the Court finds that there are triable issues of fact as to whether Wood and Carter violated Tyrell's rights under the Fourteenth Amendment to be free from excessive force.  Accordingly, Wood's and Carter's motions to dismiss that claim are denied.

As for the supervisory liability portion of the excessive force claim, plaintiff

contends that Johnson and Almond have supervisory liability for the actions of Wood,[6] based upon a "failure to train and/or supervise." (Pl. Memo of Law [#43] pp. 2, 8). Specifically, plaintiff contends that Johnson and Almond "were aware, or should have been aware of Mr. Wood's employment history – a history laced with violent [physical restraints] resulting in injuries to infant detainees." (*Id.* at 8).  As already discussed, the admissible evidence of record indicates that Wood was investigated and reprimanded twice prior to the incident involving Tyrell.[7]  The first time, Wood was reprimanded for failing to use sufficient caution to avoid injury to a resident, and the second time, he was reprimanded for, among other things, using excessive force that resulted in a laceration to a resident's face.  Both of these incidents occurred over two years before Wood was hired to work at Oatka, and there is no admissible evidence that Wood engaged in similar conduct between the date of his hiring at Oatka and the date of the injury to Tyrell.  Plaintiff cites two other incidents involving Wood, namely, the incident involving Lee Jackson, who lost consciousness and had to be hospitalized following a physical restraint[8], and the incident involving a resident at Oatka in January 2003, in which Wood allegedly used excessive force and improper technique during a restraint. However, as to the Lee Jackson incident, there is no admissible evidence in the record to indicate that Wood was ever found guilty of misconduct, and similarly, the only

---

[6]Plaintiff does not allege a claim of failure to train or supervise Carter.

[7]Although plaintiff cites additional incidents involving Wood, those incidents are not documented by evidentiary proof in admissible form in the record.

[8]Johnson clearly had notice of the Lee Jackson incident, because he was sued, in 1997, along with Wood and several other employees of the Louis Gossett, Jr. Residential Center, by Jackson's guardian. *Jackson v. Johnson*, 118 F.Supp.2d 278 (N.D.N.Y. 2000).  However, there is no indication that Wood was found guilty of wrongdoing in connection with that incident.

evidence relating to the January 2003 incident is found in an Arbitrator's Opinion and Award, which is inadmissible hearsay. (See, Footnote 1 above.).  Accordingly, the Court will not consider either the Lee Jackson incident or the January 2003 incident in resolving the subject motions.  As to the two incidents mentioned above which occurred prior to Wood being hired at Oatka, which the Court will consider, plaintiff has produced no proof that either Johnson or Almond Wood had actual notice of either incident. Instead, plaintiff contends that Johnson and Almond "should have been aware" of Wood's two instances of misconduct. (Pl. Memo of Law [#43] p. 10).

To establish supervisory liability based upon a failure to supervise,[9] a plaintiff must show that the supervisor "exhibited gross negligence or deliberate indifference to a high risk that [the employee] would violate [the plaintiff's] constitutional rights," and that such "neglect caused [the employee] to violate [the plaintiff's] rights." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002); see also, *Bryant v. Maffucci*,  923 F.2d 979, 985 (2d Cir. 1991) ("Gross negligence or reckless conduct generally imports the concept of heedless indifference to consequences to another. Leading commentators define this kind of conduct as where defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.") (citations omitted).  Liability may arise where the supervisor has either actual or constructive knowledge of the employee's dangerous propensity. *Poe v. Leonard*, 282 F.3d at 142-143.

---

[9]Plaintiff has submitted no evidence specifically relating to any lack of training.  To the contrary, plaintiff alleges that Wood was properly trained in the use of restraint procedures, but chose to disregard them in a fit of "flash anger." (Pl. Memo of Law [#43] pp. 6-7) ("Certainly Mr. Wood knew that he was not utilizing an authorized [restraint technique].  In fact, in light of Mr. Wood's training, we believe that during the brief period of his flash of anger lasted, Mr. Wood intended to physically injure Tyrell.").

Where, as here, the plaintiff alleges that a supervisor was deliberately indifferent in hiring the employee who is alleged to have violated the plaintiff's constitutional rights, it is well settled that,

> [o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"

*Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382, 1392 (1997); see also, *Poe v. Leonard*, 282 F.3d at 142 ("[Plaintiff] must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the employee] would behave inappropriately . . . but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury.").  In this regard,

> the deliberate indifference standard is not met by a showing that hiring officials engaged in less than careful scrutiny of an applicant resulting in a generalized risk of harm. The requisite showing of culpability requires a strong connection between the background of the particular applicant and the specific constitutional violation alleged.

*Kitzman-Kelley, on behalf of Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000) (citation and internal quotation marks omitted).

In applying this standard in the instant case, the Court must ask whether Almond, had he conducted a full review of Wood's employment history, would have reasonably concluded that Wood's use of excessive force would be a plainly obvious consequence of hiring him to work at Oatka. *Board of County Com'rs of Bryan County,*

16

*Okl. v. Brown*,  520 U.S. at 412-413, 117 S.Ct. at 1392 -1393 ("[W]e must ask whether

a full review of Burns' record reveals that Sheriff Moore should have concluded that

Burns' use of excessive force would be a plainly obvious consequence of the hiring

decision.").  Courts have declined to grant summary judgment where the employee had

a documented history of committing the same type of offense which he is accused of

committing against the plaintiff. *See, e.g., Raby v. Baptist Medical Center*, 21

F.Supp.2d 1341, 1354 (M.D.Ala. 1998) ("Beyond showing that Alford failed to fully look

into Mangum's background, however, Raby has also pointed to evidence that Mangum

had been confronted about his allegedly aggressive behavior and that a person

Mangum had arrested in the past needed hospitalization. Evidence of aggressiveness,

especially in the context of a suspect who required hospitalization, is tied to the

constitutional right at issue here.").

　　　In this case, it appears undisputed that if Almond had reviewed Wood's

personnel file before hiring him to work at Oatka, he would have learned that Wood had

been disciplined for using excessive force on a juvenile resident at Louis Gossett, which

resulted in serious injuries to the child.  Further, Almond would have seen that, apart

from being excessive, Wood's use of force was unjustified, and was done without first

seeking assistance from other staff, all in violation of agency policy. (Pl. Appendix Ex.

J).  Moreover, the circumstances of this earlier incident of unnecessary and excessive

force are remarkably similar to the facts alleged by Tyrell.  Additionally, Almond would

have seen that, apart from being disciplined, Wood did not receive any counseling or

additional training in the use of restraints following the incident. (Wood Dep. 27-29).

Based upon all of the foregoing, a reasonable jury could conclude that Almond was deliberately indifferent to Tyrell's safety, by selecting Wood to work at Oatka.[10] Accordingly, Almond's summary judgment motion on the excessive force claim is denied.  Johnson's motion is granted, however, as there is no indication that he was personally involved in the hiring or supervision of Wood.  To the extent that plaintiff is claiming that Johnson is personally liable based on a "pattern and practice" of the Office of Children and Family Services of allowing employees to use excessive force against residents, plaintiff has failed to produce evidence of that sufficient to raise a triable issue of fact.

<u>First Amendment Freedom of Expression</u>

In response to defendants' motions, plaintiff has clarified that the first amendment retaliation claim is asserted against Wood alone. (Pl. Memo of Law [#43] p. 11).  It is well settled that "[t]o establish a retaliation claim under § 1983 in this case, [a plaintiff] must show that (1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's action." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (citations omitted).  Plaintiff contends that Tyrell's "BK" drawing was protected by the First

---

[10]The situation might be different if Almond had reviewed Wood's history and had concluded that, despite the prior incident of excessive force, other factors made it unlikely that Wood would commit a similar violation.  For example, Almond could have spoken to Wood's supervisors at Louis Gossett to determine if Wood's improper behavior was an aberration. Compare, *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 30 -31 (1st Cir. 2005) ("Solitro's record included several complaints of excessive force while restraining juveniles, and he had an expunged conviction for assaulting Small, an off-duty minority officer. . . .  [Nevertheless,] [t]he procedures involved in the review of Solitro's application, on the undisputed facts, were not sufficiently inadequate to raise a jury question as to Providence's deliberate indifference. A background check was performed, the background investigator spoke to two of Solitro's supervisors at the juvenile facility and received good reviews, and the Small incident came to light and was discussed at Solitro's oral interview before the hiring board. That procedures were flawed does not make Providence deliberately indifferent to the risk that Solitro would use excessive force.")

Amendment, and that Wood's use of force was retaliatory.  Wood, on the other hand,

maintains that he is entitled to summary judgment on this claim for two reasons: first,

because Tyrell's drawing was gang-related or reasonably appeared to be so, and was

therefore contraband; and second, because his use of force was due to Tyrell's

threatening gesture, not his drawing.  With regard to the first assertion, Wood contends

that Tyrell "acknowledged that the letters "BK" could be construed to stand for "Blood

Killer" to anyone familiar with gang symbols and slang," citing pages 51-54 of Tyrell's

deposition. (Wood Stmt. of Facts [#36] ¶ 16).  However, that is not what Tyrell actually

stated; rather, he testified that "BK" stood for "Brooklyn." (Brown Dep. 51) (Q. And for

the Bloods does BK have any significance? A. That's – BK is where I'm from,

Brooklyn.").  Although Tyrell also stated that he had heard the phrase "blood killer," he

denied that a Blood gang member such as himself would use that term.  And, in  any

event, he insisted that the drawing was not gang related.  The drawing is not before the

Court and apparently was not preserved, and Wood does not have a clear recollection

of the drawing. (Wood Dep. 62).  Consequently, there are issues of fact regarding the

drawing.  Moreover, as for Wood's second assertion, there is an issue of fact as to

whether Wood was in fact disciplining Tyrell for the drawing or whether he was

responding to a threat.  Based upon the entire record, including Tyrell's deposition, a

reasonable juror could conclude that Wood was "cranking" Tyrell's arms to punish him

for making the drawing, and/or for denying that the drawing was gang-related.

Therefore, Wood's motion for summary judgment on the first amendment claim is

denied.

<u>Assault and Battery</u>

As for plaintiff's state-law claims for assault and battery, it is well settled that, "[t]o sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact," while "[t]he elements of a cause of action to recover damages for battery are bodily contact, made with intent, and offensive in nature." *Fugazy v. Corbetta*, 34 A.D.3d 728, 825 N.Y.S.2d 120, 122 (2d Dept. 2006).  Wood moves for summary judgment, arguing that, as a matter of law, the force he used against Tyrell was not excessive.  In that regard, Wood cites, *inter alia*, NYJUR ASSAULT § 9, which states, in relevant part:

> Generally, one who exercises reasonable force in the discharge of an official or public duty is not liable for an assault and battery. . . .  The performance of official duty is not a cloak of absolute immunity from liability for assault and battery, however, and an officer may not use any more force than is necessary under the circumstances to perform his or her duty.

As for Carter, it is unclear from his papers whether he is expressly moving for summary judgment on the assault and battery claims. (Memo of Law [#28]).  However, plaintiff apparently construed Carter's papers as containing such a motion, and the Court will do likewise. (Pl. Memo of Law [#43] p. 15).  As discussed above, there are issues of fact as to whether or not the force used by Wood and Carter was excessive or even warranted.  Consequently, Wood's and Carter's motions for summary judgment on the assault and battery claims are denied.

<u>Negligence</u>

Defendants all contend that plaintiff's negligence claims must be dismissed, since the complaint alleges, and the record shows, that Wood and Carter intentionally

used force against Tyrell.  The Court agrees that the negligence claims against Wood

and Carter must be dismissed for that reason. *Oliver v. Cuttler*, 968 F.Supp. 83, 92

(E.D.N.Y. 1997) ("New York has adopted the view that, 'once intentional offensive

contact has been established, the actor is liable for assault and not negligence, even

when the physical injuries may have been inflicted inadvertently.'") (quoting *Mazzaferro*

*v. Albany Motel Enter., Inc.*, 127 A.D.2d 374, 515 N.Y.S.2d 631, 632-33 (3d Dep't

1987)); see also, *Dineen ex rel. Dineen v. Stramka*, 228 F.Supp.2d 447, 454 (S.D.N.Y.

2002) ("When a plaintiff asserts excessive force and assault claims which are premised

upon a defendant's allegedly intentional conduct, a negligence claim with respect to the

same conduct will not lie."); *Sylvester v. City of New York*, 385 F.Supp.2d 431, 439

(S.D.N.Y. 2005) ("While it is possible to have a negligent shooting claim against a police

officer, the summary judgment record in the case establishes that the shooting was

intentional and not negligent. In view of that intentional conduct, no reasonable juror

could find that the conduct was negligent, and therefore, a claim for a negligent

shooting cannot be sustained in this case.") (citation omitted); *Busch v. City of New*

*York*, No. 00 CV 5211(SJ), 2003 WL 22171896 at  *7 (E.D.N.Y. Sep. 11, 2003)

(Dismissing negligence claim, citing *Dineen v. Stramka*).

However, the negligence claims against Johnson and Almond are not based on

intentional conduct, but instead, are based upon negligent hiring and supervision.[11]

(*See*, Complaint [#1] ¶ 81).  Consequently, the rationale for dismissing the negligence

---

[11]The only basis upon which Johnson and Almond moved for summary judgment as to the
negligence claim was that, "[w]hen a plaintiff asserts excessive force and assault claims which are
premised upon a defendant's allegedly intentional conduct, a negligence claim will not lie," quoting *Dineen*
*v. Stramka*, 228 F.Supp.2d at 454.

claims against Wood and Carter does not apply to the negligence claims against Johnson and Almond. *See, Bellere v. Gerics*, 304 A.D.2d 687, 688, 759 N.Y.S.2d 105, 107 (2d Dept. 2003) ("To hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the [employee's] propensity for the conduct which caused the injury."); *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) ("The liability of a supervisor under Section 1983 is . . .  analytically distinct from that of a subordinate who directly caused the unlawful condition or event. . . .  Given the lack of respondeat superior liability under Section 1983, a supervisor's liability is not for the use of excessive force . . . but for distinct acts or omissions that are a proximate cause of the use of that force.") (citations omitted).   However, for the reasons discussed above, the Court finds that Johnson is entitled to summary judgment, since there is no indication in the record that he was negligent with regard to Wood's hiring, retention, or supervision. On the other hand, as indicated previously, issues of fact exist as to Almond. Therefore, Almond's motion for summary judgment on the negligence claim is denied.

<u>Qualified Immunity</u>

Finally, defendants contends that they are entitled to qualified immunity.  The law in that regard is well settled:

> The doctrine of qualified immunity shields public officials from personal liability for official actions, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known.  Stated differently, an official is entitled to qualified immunity (1) if the plaintiff has not alleged a violation of a constitutional right, (2) if that right was not clearly established at the time of the conduct, or (3) if the official's actions were not objectively unreasonable in light of clearly established law.

*Almonte v. City of Long Beach*, 478 F.3d 100, 108 -109 (2d Cir. 2007).  In this case,

plaintiff has alleged violations of constitutional rights that were clearly established at the

time of the conduct, and there are triable issues of fact as to whether the actions of

Wood, Carter, and Almond were reasonable.  Thus, the motion for summary judgment

based on qualified immunity is denied.

## CONCLUSION

Accordingly, defendants' motions for summary judgment [#27] [#34] are granted

in part and denied in part.  The motions are granted in part, as follows: Johnson is

granted judgment on all claims and he is dismissed from the action; Wood, Carter, and

Almond are granted judgment on all official capacity claims; Carter and Almond are

granted judgment on the First Amendment claim; Wood, Carter, and Johnson are

granted judgment on the "intentional tort" claim (Plaintiff's "Third Cause of Action");

Wood and Carter are granted judgment on the negligence claim; and Wood, Carter and

Johnson are granted judgment on the loss of consortium claim (Plaintiff's "Sixth Cause

of Action").  Otherwise, the motions are denied as to Wood, Carter, and Almond, who

remain as defendants in this action.

So Ordered.

Dated: Rochester, New York           ENTER:
       April 3, 2007


_____           /s/ Charles J. Siragusa
                                  CHARLES J. SIRAGUSA
                                  United States District Judge